IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

| | |
|---|---|
| **IN RE: STEVEN EUBANKS and** | **3:07-bk-15913 E** |
| **JEANIA EUBANKS, Debtors** | **CHAPTER 7** |

| | |
|---|---|
| **JAMES C. LUKER, TRUSTEE** | **PLAINTIFF** |
| v. | AP NO: 3:09-ap-01258 |
| **STEVEN EUBANKS** | |
| **JEANIA EUBANKS** | |
| **INGA EUBANKS** | **DEFENDANTS** |

<u>MEMORANDUM OPINION</u>

Now before the Court is the *Complaint to Recover Fraudulent Transfer* ("**Complaint**"). The Complaint was filed by James C. Luker ("**Plaintiff**") in his capacity as the Chapter 7 Trustee. The Court held a trial in this adversary proceeding on December 2, 2010. Making appearances before the Court at the trial were Johnathan D. Horton and Kimberly W. Tucker of the firm Wright, Lindsey & Jennings, on behalf of the Plaintiff, and Warren E. Dupwe on behalf of Steven Eubanks ("**Steven**"), Jeania Eubanks ("**Jeania**"), and Inga Eubanks ("**Inga**") (collectively "**Defendants**"). This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a), and this is a core proceeding under 28 U.S.C. § 157(b)(2)(H). For the reasons stated below, the Court finds that the Debtors did not commit actual fraud; however, given the circumstances at the time of the transfer – the lack of consideration and the insolvency of the Debtors – the transfer was constructively fraudulent.

Entered On Docket: 12/29/2010

# FACTS

At the trial of this matter, held on December 2, 2010, the parties provided the Court with stipulated facts and exhibits.[1] The following stipulations were important to the Court's determination of this matter:

1. On March 9, 1994, defendant Steven Eubanks' father, Wendell Eubanks ("**Wendell**"), acquired title to an approximately 120 acre tract of land (the "**Subject Property**").[2]

2. The parties stipulated to the existence of an agreement, dated September 16, 1999 (Joint Exhibit #8). According to the terms of that agreement, Steven and Jeania were to return the subject property by conveyance to Wendell upon the occurrence of certain events, including divorce, bankruptcy, a judgment likely to be entered against Steven, the death of Steven, or "any other reason whereby said lands might be levied upon or attached in any manner . . . ."[3]

3. On April 18, 2000, Wendell conveyed a remainder interest in 80 acres of the Subject Property to Steven, Inga, and Albert D. Eubanks ("**Albert**"), as joint tenants. Within this transaction, Wendell reserved a life estate in the Subject Property for the duration of his life. This conveyance was recorded on April

---

[1] A brief introduction of the relationships between several persons involved in these facts is beneficial. Steven Eubanks and Jeania Eubanks are husband and wife, and are the Debtors in this case. Wendell Eubanks is Steven's father. Inga Eubanks is Steven's mother, as well as Wendell's ex-wife. Albert Eubanks is Steven's brother. In order to avoid confusion, the Court refers to these persons by their first names instead of by their surnames.

[2] Undisputed testimony provided at the trial explained that the Subject Property was not currently an income producing property and was not used for farming. Instead, the only demonstrated use of the Subject Property was as a place for Wendell to reside in his mobile home.

[3] The agreement references a conveyance of the Subject Property from Wendell to Steven, dated the same day as the agreement. Although no deed of conveyance was provided to the Court as evidence of that conveyance, no such evidence was necessary because the Court only considered this agreement as an indication of the parties' intent. Additionally, the record reflects that on April 18, 2000, at 8:05 a.m., the Subject Property was conveyed from Steven back to Wendell, prior to any of the conveyances at issue in this case.

2

       18, 2000, at 9:55 a.m.

4. On May 19, 2000, Wendell conveyed a remainder interest in the remaining 40 acres of the Subject Property to Steven, Inga, and Albert, as joint tenants, and again reserved a life estate for the duration of his life.

5. On June 12, 2000, Albert conveyed his interest in the Subject Property to Steven and Inga as joint tenants.

6. On January 25, 2007, Steven and Jeania[4] (collectively "**Debtors**") made a conveyance of their remainder interest in the subject property to Inga.

7. Inga did not provide the Debtors with any consideration in exchange for the property interest conveyed to her on January 25, 2007.

8. On October 25, 2007, the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code.

9. In their Statement of Financial Affairs (Joint Exhibit #10) ("**SOFA**"), the Debtors disclosed the transfer of the property interest as a transfer of property made within the two years immediately preceding the commencement of the case.[5]

10. On April 25, 2008, Inga caused a Beneficiary Deed to be filed with the Clay County Circuit Clerk, which, upon her death, would transfer the Subject Property, along with other property titled in her name, to Steven.

11. This adversary proceeding was filed on October 8, 2009, alleging that the January 25, 2007 transfer of the Debtors' remainder interest to Inga was a

---

[4] At the time of this transfer, no interest in the Subject Property had been expressly conveyed to Jeania. It is presumed, and no contrary evidence was provided at the trial, that Jeania signed this conveyance in order to transfer any marital rights or interests that she had obtained in the property as a result of her marriage to Steven.

[5] The Debtors' SOFA stated that the transfer took place on January 26, 2007, and that the Debtors' interest was subject to two life estates. In contrast, the testimony and evidence submitted at the trial provided that the transfer took place on January 25, 2007, and was only subject to one life estate. The Court determined that these discrepancies were scriveners errors and did not weigh against the Debtors' credibility.

fraudulent transfer.

12.  On March 9, 2010, Inga revoked the Beneficiary Deed.

The Plaintiff, James C. Luker, is the Chapter 7 Trustee in the Debtors' bankruptcy case. Mr. Luker testified at the trial. In his testimony, Mr. Luker explained that he became aware of the transfer of the property interest from the Debtors' SOFA, and that he questioned the Debtors about the transfer at the 341 meeting and through written inquiries. Mr. Luker testified that when he asked the Debtors why they had transferred the property, Steven responded that "he was attempting to obtain a loan from the bank in connection with his farming operation and he was fearful that he would be required to mortgage this property, and he did not wish to do so . . . and so, his stated reason was to avoid having to mortgage it to the bank."

Mr. Luker provided the Court with his estimation of the value of the Subject Property. He based this valuation on his review of the county tax records, his own personal experience with similar properties, and his belief that the property could be used for hunting and recreational purposes. Based on these considerations, Mr. Luker estimated the property to be worth more than $1,000 per acre. Mr. Luker testified that he had asked Steven about the value of the property at the 341 meeting, but that Steven's only reply was that his father had purchased the property for $54,000 With regard to the remainder interest in the property, Mr. Luker testified that, based on his review of actuarial tables, he believed it to have a value of 44 - 45% of the value of the Subject Property.

4

Steven Eubanks also testified at the trial. Steven testified that he has made his living as a farmer since 1999. He explained that his wife, Jeania, works for the Farm Services Agency, that his father was a farmer, and that the Debtors consider themselves to be a farming family. He explained that in his line of work some years are better than others, and that in the past he has had to restructure losses from a bad crop into the next year's loan in order to continue his farming operations. Steven testified that 2006 was a particularly difficult year due to a medical problem that required that he be hospitalized for eight days, and because of damages to his crops from a chemical spray that had drifted onto his and many other farmers' crops.

Steven testified that on January 19, 2007, he had a meeting with his crop loan officer at Kennett National Bank ("**KNB**" or "**Bank**"). The purpose of that meeting was to discuss refinancing the crop loan in order to allow the Debtors to continue farming in 2007. Steven testified that at the time of this meeting all of his debts were current. At the meeting, Steven and his loan officer, Mr. William Mowrer, created a balance sheet (Plaintiff's Exhibit #4) that estimated the Debtors' total assets and liabilities. According to the balance sheet, the Debtors' total assets were worth $1,147,313, and the Debtors' had liabilities in the amount of $1,049,407. A statement at the top of this balance sheet instructs the preparer to "[l]ist all assets at fair market value."

Steven testified that at the time the Debtors transferred their interest in the subject property he had every intention of continuing his farming operations, and stated specifically

5

that he had no intent to delay or defraud anyone by transferring the property. He explained that, as far as he was concerned, his father was still the owner of the property and that he would not gain his rights to it until his father's death. Steven testified that his reason for making the conveyance was because his father asked him if he would do so. Further, when asked by the Court to explain in his own words why he transferred the property on the day that he did, his testimony was as follows:

> Well, for one reason my father asked me to. He had his own reasons for approaching me with this . . . and, after he approached me with it, and I looked at it, I thought, if I do get to go to the bank and we do get to sit down and restructure our debt and I do get to farm another year — I'm thinking . . . in January I'm thinking two or three years ahead trying to figure out how I'm going to get to keep on farming, and do it on my own, so to speak, without anybody co-signing for me or anything. In my own words, I just didn't want this [to be] a part of the farm. If I was gonna keep on farming, I just didn't want it in my name for the fact that — or, where it could come to me, if that life estate got executed seven, eight months on down the line. A farmer, when he gets his back against the wall, he'll do just about anything he can to keep on farming, whether it's to take your inheritance, or whatever, but I just didn't want to do that. I wanted to do it all on my own. I felt like beyond whatever other reasons he had for asking me to sign it, I felt it would [be] fine for me for going on and farming to not have anything to do with it . . . for it not ever to fall in my lap while I was farming.

Steven also testified that he specifically recalled the exact date that the Bank called to tell him they would not refinance his crop loan because it was Valentine's Day, February 14, 2007, and he was going to have to give his wife that news. When asked why the Bank had decided not to refinance his loan, Steven testified that the Bank had told him "that they weren't going to be able to process my loan . . . that it was just not enough for their Bank to go ahead, but that there might be other alternatives to getting funding." Steven testified that

this was the point at which he communicated to the Bank that he would not be able to continue farming. Specifically, he told the Bank that he was going to call an auctioneer and they would have a sale to try to pay off the loan.

On March 15, 2007, Steven sold the majority of his farming equipment at an auction for $251,475. In addition, the Debtors' SOFA shows that a piece of farming equipment, referred to as a 6 Row Cotton Picker, sold for $109,501, and a vehicle sold for $21,000, after being either surrendered or repossessed in 2007. In total, the Debtors' 2007 tax return indicates that $442,303 in property was sold by the Debtors during 2007. The Debtors bankruptcy schedules, filed October 25, 2007, place a value of $141,649 on the property they had remaining at the time of filing.

When asked about the value of the Subject Property, Steven replied that he was not able to provide an estimation of the value. He explained that he had never considered the Subject Property to be his, and had never considered it an asset. When asked why the property was not included as collateral on his crop loan, Steven replied that it was not a part of the farm property and was not an income producing property.

Finally, Steven also testified that he only learned of the Beneficiary Deed filed by his mother, Inga, through these proceedings, and that he had no knowledge of it prior to that time.

The only other witness at the trial was William Mowrer. Mr. Mowrer was the loan officer at Kennett National Bank. KNB had handled the Debtors' crop loan since 1999, and

7

Mr. Mowrer had personally handled the loan since 2004. Mr. Mowrer testified that the purpose of the January 19, 2007 meeting was to see if they could restructure the 2006 loan deficiency in order to roll it into a loan for 2007. Steven testified that the Bank had previously rolled his crop loan deficiency from one year into the loan for the following year. Mr. Mowrer testified that, during the meeting, he indicated to Steven that it would be difficult for the Bank to refinance the loan; however, he testified that he was not the person who would ultimately make that decision. Further, although Mr. Mowrer stated at trial that he believed the asset values on the balance sheet to be high, he also stated that Steven never tried to mislead him in any way. Additionally, Mr. Mowrer testified that Steven fully cooperated with the Bank in the sale, including bringing in buyers for the merchandise.

## ANALYSIS

The Trustee seeks to set aside the transfer of a property interest in real property made by the Debtors to Inga Eubanks. The Bankruptcy Code empowers a trustee to avoid certain pre-petition transfers. One such power is found in 11 U.S.C. § 548, which allows the trustee to avoid fraudulent transfers. A second avoidance power is found in 11 U.S.C. § 544(b), which allows the trustee to invoke the relevant state law of fraudulent transfers – here, the Arkansas Fraudulent Transfer Act, Ark. Code Ann. § 4-59-201, *et seq.* – in order to avoid such transfers.[6]

---

[6] Ark. Code Ann. § 4-59-204 is the state law analog of 11 U.S.C. § 548. The Eighth Circuit has, on numerous occasions, referenced a congressional intent to bring the bankruptcy law of fraudulent transfers into conformity with the analogous state laws. *See In re Graven*, 936 F.2d 378, 383 (8th Cir. 1991); *In re Craig*, 144 F.3d 587, 593 (8th Cir. 1998); *In re Sun Valley*

The primary purpose of fraudulent transfer law is to avoid transactions that "unfairly or improperly deplete a debtor's assets or that unfairly or improperly dilute the claims against those assets." *In re S.W. Bach & Co.*, 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010) (citations omitted). Transfers that are deemed fraudulent and capable of being avoided fall into two distinct categories of transactions – those made by means of actual fraud,[7] and those deemed constructively fraudulent.[8] *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994). Under either theory, the burden of proof falls to the party claiming that fraud has occurred, and this burden must be met by a preponderance of the evidence. *In re Brown*, 265 B.R. 167, 171 (Bankr. E.D. Ark. 2001); *In re Craig*, 144 F.3d 587, 590 (8th Cir. 1998); *In re Jacobson*, 48 B.R. 497, 501 (Bankr. D. Minn. 1985).

**1. ACTUAL FRAUD**

A trustee may avoid a pre-petition transfer of assets if the transfer was made within two years prior to the filing of the bankruptcy case, and was made with the "actual intent to hinder, delay, or defraud" any past or future creditor. 11 U.S.C. § 548(a)(1)(A). The "actual intent" required under this provision can be inferred from circumstantial evidence. *In re*

---

*Prods., Inc.*, 328 B.R. 147, 155 (Bankr. D.N.D. 2005) ("Considering the similarities in purpose and language, many courts have concluded that the UFTA and section 548 are *in pari materia*, and that the same analysis applies under both laws."). As a consequence of the parallels between the state and federal law on this matter, the Court finds it unnecessary to provide a separate analysis of each provision. A determination under 11 U.S.C. § 548 would undoubtedly necessitate a similar determination under Arkansas law. As such, the Court's analysis will speak primarily to § 548, but the Court will note any relevant distinctions between the laws.

[7] Addressed under 11 U.S.C. § 548(a)(1)(A) and Ark. Code Ann. § 4-59-204(a)(1).

[8] Addressed under 11 U.S.C. § 548(a)(1)(B) and Ark. Code Ann. § 4-59-204(a)(2).

*Brown*, 265 B.R. at 172; *In re Sherman*, 67 F.3d 1348, 1353 (8th Cir. 1995); *In re Carter*, 203 B.R. 697, 706 (Bankr. W.D. Mo. 1996). Allowing circumstantial evidence to meet the burden of proof in such cases is often necessary because direct evidence is generally constrained by the nature of the allegations. *In re Houston*, 385 B.R. 268, 271-72 (Bankr. N.D. Iowa 2008). Indeed, some circumstances are presented to the courts with such repetition that they are characterized as "badges of fraud." *Id.*; *see also In re Baugh*, 60 B.R. 102, 104 (Bankr. E.D. Ark. 1986).

The existence of a single "badge of fraud" is generally insufficient to establish fraudulent intent for purposes of proving actual fraud. *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000). On the other hand, where a "confluence"[9] of the "badges of fraud" are found, a presumption of a fraudulent intent arises within the case. *Id.; see also In re Bateman,* 646 F.2d 1220, 1223 (8th Cir. 1981). Where this presumption arises, the burden of production shifts to the defendant to provide a "legitimate supervening purpose" for the transfer. *In re Armstrong*, 206 F.3d at 798 (*citing In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)) (internal quotations omitted); *In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 360 (Bankr. D. Minn. 1999) (describing overcoming the presumption to be a "heavy burden"); *but see In re Arbaney*, 345 B.R. 293, 301 (Bankr. D. Colo. 2006) (explaining the burden as one of going forward with the evidence, and not the burden of persuasion).

---

[9] Merriam-Webster Dictionary defines the term confluence as "a coming or flowing together, meeting, or gathering at one point." Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/confluence (last visited December 21, 2010).

10

Courts within the Eighth Circuit often point to the following factors in determining whether a debtor acted with an intent to hinder, delay or defraud:

> (1) lack or inadequacy of consideration; (2) family, friendship or other close relationship between the transferor and transferee; (3) retention of possession, benefit or use of the property in question; (4) financial condition of the transferor prior to and after the transaction; (5) conveyance of all of the debtor's property; (6) secrecy of the conveyance; (7) existence of [a] trust or trust relationship; (8) existence or cumulative effect of pattern or series of transactions or course of conduct after the pendency or threat of suit; (9) instrument affecting the transfer suspiciously states it is bona fide; (10) debtor makes voluntary gift to family member; and (11) general chronology of events and transactions under inquiry.

*In re Richmond*, 429 B.R. 263, 305 (Bankr. E.D. Ark. 2010); *see also In re Schroff*, 156 B.R. 250, 254 (Bankr. W.D. Mo. 1993); *In re Rodgers*, 315 B.R. 522, 531 (Bankr. D.N.D. 2004).[10] Alternatively, some courts have utilized the relevant state law codification of the common law badges of fraud in order to make this determination. *See In re Wright,* 353 B.R. 627, 652 (Bankr. E.D. Ark. 2006); *In re Sherman*, 67 F.3d at 1354.[11]

---

[10] The cited cases deal with the intent to hinder, defraud or delay, as a requirement for an objection to discharge under 11 U.S.C. § 727(a)(2). However, these provisions use identical language, which has been similarly construed by the courts. *See, e.g., In re Addison*, 540 F.3d 805, 811-12 (8th Cir. 2008) (construing the language found in 11 U.S.C. § 548(a)(1)(A) to have the same meaning as the identical language found in 11 U.S.C. § 727(a)(2)).

[11] The common law badges of fraud have been codified into the Arkansas Code at Ark. Code Ann. § 4-59-204(b)(1)-(11), which provides the following list of considerations:

> (1) the transfer or obligation was to an insider; (2) the debtor retained possession or control of the property transferred after the transfer; (3) the transfer or obligation was disclosed or concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all of the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent

11

The Court finds that a confluence of the "badges of fraud" are present in this case. Specifically, the Court points to the fact that Inga is Steven's mother and, pursuant to 11 U.S.C. § 101(31), is considered an insider. The parties stipulated to the fact that no consideration was provided for the transfer of the property interest. The Debtors were insolvent[12] and attempting to refinance a loan at the time of the transfer. Further, the chronology of events in this case could logically propel the Court toward a finding of fraud.[13]

In contrast, however, some of the circumstances that are generally considered badges of fraud must be re-characterized on the facts of this case as badges of honesty. Particularly, the Debtors disclosed the transaction in their SOFA, answered questions about the transaction at the 341 meeting, and provided information to the trustee in response to his written inquiries. Additionally, it is evident that the transferred property interest was not a

---

or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

The majority of these factors are duplicates of the factors provided in the text, *supra*. All others will be discussed to the extent they are relevant.

[12] An analysis of the Court's determination that the Debtors were insolvent is provided in greater detail within the constructive fraud discussion, *infra*.

[13] The Debtors transferred the property six days after meeting with their loan officer to discuss refinancing the crop loan. The loan officer testified that at that meeting, he had indicated to Steven that it was unlikely the Bank would refinance the loan. Less than one month after the transfer, the Debtors communicated to the Bank that they were not going to continue farming and would have a sale of their property in order to pay off the debt. The sale of their property occurred within two months of the transfer. Within nine months after the transfer, the Debtors filed for bankruptcy.

substantial portion of the Debtors' assets. Even accepting the Plaintiff's estimated value for the property of approximately $1,000 per acre, the Debtors' interest in the property would be worth only about $27,000,[14] which would be insubstantial when compared to any reasonable valuation of the Debtors' assets. Further, the Debtors were in constant contact with their creditors. The testimony made clear that when the Bank told Steven they would not refinance his loan, he promptly communicated to them that he would not be able to continue his business operations, and cooperated with them to arrange a sale of his property in order to pay off the loan. The testimony provided at the hearing also acknowledged that the Debtors were of assistance in selling the property, and the loan officer for the Bank testified that he did not believe the Debtors tried to mislead him in any way.[15]

Furthermore, the Debtors were able to present convincing evidence of a legitimate supervening purpose for the transaction. Steven testified that he did not intend to hinder, delay, or defraud his creditors in making this transfer. While the Court recognizes the self-serving nature of such statements, it is within the Court's prerogative to decide if a witness

---

[14] The Plaintiff testified that he believed the property to have a value in excess of $1,000 per acre. This property consists of 120 acres, so the value of the property would be approximately $120,000. According to the Plaintiff's testimony, a remainder interest in this property would have a value of 44 - 45% of the property value, or $54,000. The Plaintiff further alleged that the value of a joint tenancy in a remainder interest would equal one-half of the value of that remainder interest, or $27,000.

[15] The remaining "badges of fraud" were not relevant to this case. There was no evidence that the Debtors were threatened with a lawsuit, there was no evidence that the Debtors concealed assets, no strawman was used, there was no trust involved, and there was nothing particularly suspicious about the language of the conveyance.

is credible. The Court took note that Steven's testimony exemplified a strong personal character and a commitment to full disclosure. Additionally, in delivering his testimony, Steven abstained from any attempt to shade or re-frame the circumstances that were to be construed against him. In essence, the Court finds Steven Eubanks' testimony to be genuine, forthright, and credible.

More specifically, Steven testified that he received this property interest from his father, and would not have considered it his property so long as his father was alive. While this notion may be legally incorrect, the Court found it to be an honest statement of his perception of the situation, which is relevant to the Court's determination of whether actual fraud existed. Further, Steven testified that the catalyst for the transfer was his father's request that he transfer it. He also testified that he transferred the interest because, in planning to continue farming in the future, he realized that he did not want to receive the property when his father's life estate ceased. Steven testified that he was concerned that if he received ownership of the property that he might mortgage it in order to continue his farming operations. In his own words, Steven explained that "when [a farmer] gets his back against the wall, he'll do just about anything he can to keep on farming," and that he did not want the property to come to him because he wanted to "do it on his own."

The Court concludes from this testimony that the Debtors' intended purpose in transferring their remainder interest in the Subject Property was *not* to prevent their creditors from obtaining that interest. Instead, the purpose of the transfer was to comply with Wendell

14

Eubanks' request that they transfer the property interest back to him, and to prevent themselves from obtaining a fee ownership interest in the Subject Property that they might mortgage, at some point in the future, in order to continue their farming operations. Therefore, the Court finds that despite the presence of several badges of fraud, there was a legitimate supervening purpose for the transfer and no actual fraud existed.

**2.     CONSTRUCTIVE FRAUD**

A trustee may avoid a transfer as fraudulent if the debtor received a less than reasonably equivalent value in exchange for the transferred property, and at the time of the transfer the debtor:

> (1) was insolvent, or became insolvent as a result of the transfer,
> (2) had unreasonably small capital to conduct its business,
> (3) intended to, or believed it would, incur debts beyond its ability to pay, or
> (4) made the transfer to or for the benefit of an insider under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B). In the constructive fraud context, no finding with regard to the state of mind of the transferor is necessary. *In re Hatten*, 279 B.R. 710, 735 (Bankr. D. Del. 2002). In fact, some courts have branded the term "constructive fraud" a misnomer, as it implies a state of mind without requiring that a state of mind exist. *In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 365 n.54 (Bankr. D. Minn. 1999) ("Given the intent-neutrality of the statutory elements, it is a misnomer and unnecessarily inflammatory to tag such transactions with the word 'fraudulent.' Nonetheless, the title of § 548 does so.").

15

There is no question in this case that the Debtors received a less than reasonably equivalent value in exchange for the transfer of their property interest. The parties stipulated that no valuable consideration was given by Inga in exchange for the property interest. As such, the first requirement of constructive fraud, found in 11 U.S.C. § 548(a)(1)(B)(i), is met. Therefore, the focus of the Court's analysis falls to the second requirement for proving constructive fraud. This requirement is met if the Plaintiff proves the existence of any one of the four alternate provisions found in 11 U.S.C. § 548(a)(1)(B)(ii), as set out above.

The first theory of constructive fraud applicable to the circumstances of this case asks whether the Debtors were insolvent at the time of, or as a result of, the transfer. 11 U.S.C. § 548(a)(1)(B)(ii)(I). The Bankruptcy Code defines the term insolvent as follows:

> [A] financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of (i) property transferred, concealed or removed with the intent to hinder, delay, or defraud such entity's creditors[,] and (ii) property that may be exempted from the property of the estate under section 522 of this title.

11 U.S.C. § 101(32)(A). Many courts have referred to this type of insolvency as "balance sheet" insolvency. *See Universal Church v. Geltzer,* 463 F.3d 218, 226 (2d Cir. 2006), *cert. denied*, 549 U.S. 1113, 127 S.Ct. 961, 166 L.Ed.2d 706 (2007). The basic requirement of this form of insolvency is that a debtor's assets exceeded her liabilities on the date that the transfer in question took place. *Id.* The rationale behind the requirement that a debtor be found insolvent in order to prove constructive fraud is that "[a]s long as creditors are not disadvantaged by the low sale price (because the debtor otherwise is sufficiently liquid to

16

cover his debts), then the debtor is free to sell (or, more specifically, undersell) his property for whatever price he likes." *In re Seitz*, 400 B.R. 707, 720 (Bankr. E.D. Mo. 2008).

In this case, the Court finds that the Debtors were insolvent at the time of the transfer. The Court makes this determination after considering two very different calculations of solvency derived from the exhibits and testimony provided at trial. The first calculation was simply derived from the Bank's balance sheet created by Steven and his loan officer during their meeting on January 19, 2007. This balance sheet reflected a value of the Debtors' total assets in the amount of $1,147,313, and total liabilities in the amount of $1,049,407. Based on these figures, the Debtors had a net worth of $97.906. If these figures alone were considered, the Court would have no trouble concluding that the Debtors were solvent on the date of the transfer.

However, a second calculation derived from the record provides a very different picture. This second calculation takes into consideration the Debtors' 2007 tax return and the Debtors' bankruptcy schedules. In their 2007 tax return, the Debtors claim to have sold property in the amount of $442,303.[16] On October 25, 2007, the Debtors filed schedules that estimated the value of their assets to be $138,174.22.[17] Combining these two figures, the

---

[16] This amount consists of $251,475 attributable to the sale of the Debtors' farming equipment at an auction held on March 15, 2007; and $109,501 for a 6 Row Cotton Picker, and $21,000 for a truck, both of which were listed as surrendered or repossessed in the Debtors' SOFA. Steven testified that the remaining difference was attributable to the sale of personal property within that year.

[17] The Debtors schedules actually state the value of their total assets as $141,649.22, but

17

maximum value of the property owned by the Debtors in 2007 would be $580,477.22.[18]  A balance sheet calculation based on these figures would leave the Debtors with a *negative* net worth in the amount of $468,929.78.[19]

The reality of the Debtors' financial condition at the time of the transfer lies somewhere between these two calculations. A convincing argument can be made on behalf of both. The balance sheet was created just six days prior to the transfer. It was created by a bank loan officer who owed a duty to his employer to see that these numbers were accurate. Indeed, the balance sheet form instructs the preparer to "[l]ist all assets at fair market value." On the other hand, the second calculation was based largely on actual sale prices, and was created using figures supplied by the Debtors' 2007 tax return and bankruptcy filings.

However, there are also legitimate grounds causing concern about the accuracy of both of these value calculations. Mr. Mowrer, the bank loan officer, testified that he believed the value figures on the balance sheet were too high, and it is true that many of the items listed on the balance sheet sold at the auction for an amount considerably less than their stated value. With regard to the second calculation, the Court must take the liquidation and

---

they claimed exemptions in the amount of $3,475. The definition of insolvency requires that the assets amount be reduced by the value of any claimed exemptions. 11 U.S.C. § 101(32)(A)(ii).

[18] $442,303 (value of all property sold in 2007) + $138,174.22 (value of property retained at the time of filing, October 25, 2007) = $580,477.22.

[19] The Court used the same total liabilities amount in this calculation as in the prior calculation because it is the estimation of the Debtors' liabilities closest in time to the transfer. Accordingly, $580,477.22 – $1,049,407 = (-$468,929.78).

foreclosure nature of the sales into account in evaluating the value of the properties sold.

While the possible flaws in these two calculations prevent the Court from arriving at a precise determination of the value of the Debtors' assets on the date of the transfer, the evidence provided was sufficient to convince the Court that the value stated on the Bank's balance sheet was overstated by an amount in excess of the $97,906 net worth provided therein. As a result, the Court finds that the Debtors were insolvent on the date of the transfer, and that the constructive fraud requirement of insolvency, found at 11 U.S.C. § 548(a)(1)(B)(ii)(I), is met. Because the Plaintiff needs to prove only one of the four alternate provisions found in 11 U.S.C. § 548(a)(1)(B)(ii)(I)-(IV), the Court does not need to address the Plaintiff's allegations that the Debtors had an unreasonably small amount of capital to continue their business operations (11 U.S.C. § 548(a)(1)(B)(ii)(II)), or that the Debtors intended to incur debts beyond their ability to pay (11 U.S.C. § 548(a)(1)(B)(ii)(III)).

Therefore, having found that the Debtors received less than a reasonably equivalent value in exchange for the transfer, thus satisfying the first requirement of constructive fraud under 11 U.S.C. § 548(a)(1)(B)(i), and that the Debtors were insolvent on the date of the transfer, thus satisfying the second requirement for constructive fraud under 11 U.S.C. § 548(a)(1)(B)(ii)(I), the Court finds that constructive fraud existed under the facts and circumstances of this case.

## CONCLUSION

The Plaintiff is entitled to judgment in his favor. The January 25, 2007 transfer of the Debtors' property interest to Inga Eubanks was a constructively fraudulent transfer in violation of 11 U.S.C. § 548(a)(1)(B). The trustee may pursue its rights to recover the property interest or the value of the property interest in accordance with 11 U.S.C. § 550(a). A separate judgment in accordance with this Memorandum Opinion will be entered by the Court.

**IT IS SO ORDERED.**

*Audrey R Evans*
Audrey R. Evans
United States Bankruptcy Judge
Dated: 12/29/2010


cc:  Attorney for plaintiff(s)
     Attorney for defendant(s)
     Debtor(s)
     Trustee
     U.S. Trustee